E-FILED
Friday, 14 September, 2012  03:55:08 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEFFREY L. COURTOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3427 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jeffrey Courtois appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Courtois filed a Motion for Summary Judgment (d/e 8), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 13).  The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.  <u>Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered June 20, 2012 (d/e 11)</u>.  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Courtois was born on October 1, 1961.  He completed the tenth grade and worked as a janitor and grocery store stocker.  He stopped working on August 12, 2007.  Answer to Complaint (d/e 6), attached Certified Transcript of Proceedings before the Social Security Administration (R.), at 39, 207, 2011.  Courtois suffers from chronic obstructive pulmonary disease (COPD), hypertension, obesity, degenerative joint disease, venous peripheral insufficiency, back pain, and depression.

On June 27, 2007, Courtois went to see Dr. Michael R. Hambrick, M.D.  Dr. Hambrick found that Courtois had swelling in his hands and feet, edema and venostasis dermatitis in his legs.  Dr. Hambrick recommended compression stockings.  Courtois also had marked diminished breath sounds.  Courtois reported that he had smoked a pack of cigarettes a day for twenty years.  Dr. Hambrick ordered pulmonary function tests, a chest x-ray, and an overnight oximetry study.  Dr. Hambrick also found that Courtois was obese.  Dr. Hambrick and Courtois talked about losing weight and exercising.  R. 350-51.

On July 2, 2007, Courtois underwent a pulmonary function test.  The test was performed by Dr. Nanjappa Somanna, M.D.  The spirometry

showed an FEV1 of 1.39 liters and an FVC of 2.58 liters.[1]  After a

bronchodilator therapy, Courtois had an FEV1 of 1.70 liters, a 22%

improvement.  Lung volume testing showed lung capacity of 93% predicted

with an RV of 170% predicted.  Dr. Somanna concluded that Courtois had

severe obstruction with significant change after post-bronchodilator

therapy.  The lung volumes showed air trapping with DLCO mildly

diminished.[2]

On July 11, 2007, for a followup.

        Courtois saw Dr. Hambrick again on July 11, 2007, for a followup.

The records indicate that he was 5 feet 9 inches tall and weighed 316

pounds.  Dr. Hambrick stated that the pulmonary function test showed that

Courtois had severe obstructive deficit that was significantly improved with

bronchodilation. The oximetry study showed that Courtois needed oxygen

during the night and probably during the day.  R. 343, 353, 358, 360-61,

363-68.

        On January 2, 2008, Courtois saw Dr. Jessica Town, D.O.

Dr. Town's notes indicate that Courtois previously used respiratory

medication and oxygen, but currently could not afford either.  Courtois

reported that he was trying to quit smoking.  He reported that he had been

---

[1]FEV1 stands for "one second forced expiratory volume," and FVC stands for "forced vital capacity."  See 20 C.F.R. Part 404 Subpart P, Appendix 1 Listing 3.00 (E.).

[2]DLCO stands for the diffusing capacity of lungs for carbon monoxide.  See 20 C.F.R. Part 404 Subpart P, Appendix 1 Listing 3.00 (F).

smoking three packs of cigarettes per day, but had cut down to one pack per day.  Courtois reported that he could not walk upstairs or more than one block without shortness of breath.  Dr. Town found markedly decreased breath sounds with prolonged expiration and expiratory wheezing, but no rhonchi or crackles.  Dr. Town gave Courtois samples of medication and information on agencies to help pay for medication and oxygen.  Dr. Town also discussed the importance of quitting smoking and using money to buy medication rather than cigarettes.  Dr. Town also found that Courtois had some venous stasis ulcers on his legs that were healing. R. 347-48.

On January 14, 2008, Courtois filed his claim for Disability Benefits. He alleged that he was disabled on August 12, 2007, when he stopped working.  R. 16.

On April 24, 2008, Courtois went to see Certified Nurse Practitioner Julie Barry at the Blessing Hospital Outreach Clinic in Quincy, Illinois.[3] R. 377-82.  Courtois reported difficulty breathing at night and swelling in his hands and feet.  Courtois also reported stiffness in both knees.  Courtois was 5 feet 8 inches tall and weighed 336 pounds.  Barry found edema in

---

[3]The parties refer to Barry as a doctor; however, the medical records indicate that she was a Certified Nurse Practitioner.  The designation of "CNP" appears after her name on at least one document, indicating that she was a Certified Nurse Practitioner. R. 383.  She also worked under the supervision of a Dr. Philip Wilson, M.D., and she did not place the designation of "M.D." or "D.O." after her printed name on her signature lines.  E.g., R. 378, 382.

the legs, ankles and feet, and leg ulcers.  Barry referred Courtois to the wound clinic for evaluation of the ulcers.  R. 381-82.  Barry also prescribed an inhaler and ordered a chest x-ray.  The chest x-ray showed some mild atelectatic or fibrotic changes.  R. 382, 386.

On April 25, 2008, Courtois saw Dr. Crystal Perry, M.D. at the Blessing Hospital wound clinic.  Dr. Perry biopsied and dressed Courtois' leg ulcers.  Dr. Perry told Courtois to elevate his legs whenever possible and to avoid salt.  R. 393-94, 400, 410.

On May 2, 2008, Courtois went to see Dr. Perry.  Courtois reported that his legs were much better.  Courtois had been wearing his tubigrip compression stockings faithfully.  On examination, Dr. Perry found significantly less edema and no open sores.  R. 396.

On May 22, 2008, Courtois saw Barry again for a followup visit.  Courtois said that his legs were better, but he complained of back and knee pain.  He also complained of dyspnea with exertion.  R. 376.  Courtois saw Dr. Perry again on May 23, 2008.  Courtois reported that he was doing well.  Dr. Perry found that Courtois' ulcers had healed and a trace of edema in the lower extremities.  R. 397.

On July 3, 2008, Courtois saw Barry again for a six-week followup visit.  Courtois' weight was down to 317 pounds.  Courtois had no swelling in his feet.  He was finished with the wound clinic treatments on his legs.

He reported increased pain in his right knee with activity.  He was taking ibuprofen and Tramadol for the pain.  Courtois reported that his breathing was okay.  On examination, Barry found that Courtois' skin was flaking, but well-healed.  Barry observed wheezing at the posterior bases bilaterally.  Barry also found crepitation in the right knee with movement.  Barry discussed quitting smoking with Courtois, refilled his prescriptions, and ordered an MRI of the right knee.  R. 435.   The MRI was performed on July 8, 2008.  The test showed chronic degenerative osteoarthritic changes in the right knee.  R. 403, 433.

On July 12, 2008, Courtois saw Dr. Raymond Leung, M.D. for a consultative examination.  Courtois reported that he had problems with veins in his legs and with COPD.  Courtois said that he started smoking at the age of nine.  He used to smoke four packs of cigarettes per day, but was now down to one pack per day.  Courtois stated that his ability to walk varied due to his shortness of breath.  Courtois said that he could lift fifty pounds.  Courtois was 5 feet 8½ inches.  He weighed 314 pounds.  Dr. Leung noted healing wounds on both lower legs.  Dr. Leung found decreased breath sounds, but no rales, rhonchi or wheezes.  Dr. Leung found no use of accessory muscles for respiration at rest.  R. 414.

Dr. Leung observed that Courtois' gait was within normal limits.  Courtois could walk 50 feet unassisted.  He could tandem walk, heel walk,

toe walk, squat, and hop.  Straight leg testing was to 40 degrees.  Courtois had normal strength throughout his extremities.  Dr. Leung found no lower extremity peripheral edema, lesions or ulcers.  Dr. Leung diagnosed Courtois with COPD with decreased breath sounds on examination, but no respiratory distress.  Dr. Leung stated that pulmonary function tests in Courtois' medical records showed borderline obstruction with severe restriction before bronchial medication and borderline obstruction with mild restriction after medication.  R. 414.

On July 12, 2008, Courtois underwent another pulmonary function test.  The record of the test submitted to the Social Security Administration consists of unsigned graphs with tables of data from the West Park Medical Clinic.  The document does not identify the person who conducted the test. The table shows an FEV1 of 1.59 liters and an FVC of 2.40 liters before bronchodilation, and an FEV1 Of 1.98 liters and an FVC of 2.98 liters after bronchodilation.  R. 416-17.

On July 25, 2008, Dr. Sandra Bilinsky, M.D., reviewed Courtois' medical records and completed a Physical Residual Functional Capacity Assessment (RFC Assessment). R. 419-26.  Dr. Bilinsky opined that Courtois could lift 10 pounds frequently; stand and/or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb, but never balance; and avoid concentrated exposure to fumes,

odors, dusts, gases, and poor ventilation.  Dr. Bilinsky found no other

physical limitations.  R. 420-26.

On August 21, 2008, Courtois saw Barry again. Courtois' primary

complaint was pain in his knees.  Courtois reported swelling on occasion in

his right knee.  On examination, Barry observed that the right knee was

larger than the left.  Barry also found tenderness around the patella and

crepitation with extension and flexion.  Barry diagnosed Courtois with

osteoarthritis with medial meniscus tear, right knee.  Barry prescribed

Celebrex for pain.  Barry found Courtois' lungs to be clear to auscultation

bilaterally.  R. 433.

On September 25, 2008, Courtois saw Barry again for a followup

visit.  Courtois reported some benefit from his respiratory medicines.  He

reported that he was able to walk approximately one-half block before

stopping with shortness of breath.  Courtois reported that he still smoked

two packs per day "but is not interested in smoking cessation at this point."

R. 431.  Barry observed no peripheral edema.  Courtois qualified for

disability with Medicaid and, thus, would end his care at the Blessing

Hospital Outreach Clinic and establish care at Quincy Family Practice.

R. 431.[4]

---

[4]The records from Dr. Town state that Courtois qualified for Medicare disability
rather than Medicaid disability.  R. 484.

On October 14, 2008, Courtois saw an orthopedist Dr. Ronald Wheeler, M.D.[5]  Dr. Wheeler diagnosed Courtois with a possible tear in the right medial meniscus, probably degenerative, and degenerative joint disease in the right knee.  Dr. Wheeler recommended conservative measures and exercise rather than surgery.  R. 438.

On October 20, 2008, Courtois saw Dr. Town for COPD and knee pain.  Courtois was using a rescue inhaler two to three times per day.  Courtois was smoking one pack of cigarettes per day.  Courtois was interested in trying Chantix to quit smoking, but reported recently starting therapy for depression and anxiety.  He therefore was not given Chantix.  Courtois reported continuing knee pain.  Courtois said that he had knee pain for eight or nine years.  He said that the pain increased in cold weather or when he did not move the knee.  Dr. Town offered injections in the knee, but Courtois refused.  Dr. Town referred Courtois for physical therapy and modified his COPD medication.  R. 484.

On November 3, 2008, Courtois went to Blessing Hospital for a physical therapy evaluation.  The evaluation states that Courtois walked with a straight cane that Courtois recently purchased.  Courtois reported that the cane helped.  The evaluation stated that Courtois had good

---

[5]The cover letter from Courtois' attorney (R. 437) states that the medical record, R. 438, was from Dr. Ronald Wheeler.  The one-page record does not contain Dr. Wheeler's name.

rehabilitation potential to achieve stated therapy goals.  The evaluation recommended physical therapy once a week for three to four weeks. Courtois reported that it was difficult to come to therapy because his family only had one car.  R. 440-42. Courtois did not call or show for further therapy sessions.  R. 443. Courtois was discharged from therapy on November 19, 2008, for failure to show for treatment or call.  R. 443.

On November 5, 2008, Dr. Michael Nenaber, M.D., reviewed Dr. Bilinsky's RFC Assessment on reconsideration.  Dr. Nenaber reviewed the medical records received through October 30, 3008, and affirmed the opinions of Dr. Bilinsky.  R. 446-47.

On November 18, 2008, Courtois again saw Dr. Town.  Courtois reported that he was trying to quit smoking, but was back up to two packs per day.  Courtois was again interested in Chantix, but was still complaining of depression.  Courtois reported crying, anhedonia, difficulty sleeping, increased hunger, and isolating himself.  The notes state that the physical therapist who evaluated him felt that Courtois would not benefit from physical therapy without surgery.  The notes do not indicate whether Courtois relayed this opinion from the therapist or Dr. Town spoke directly to the therapist.  Dr. Town stated that Courtois had difficulty walking and used a cane.  Dr. Town noted that Courtois had no edema.  R. 482.

On December 18, 2008, Courtois saw Dr. Town again.  Courtois had prolonged expiration with decreased breath sounds.  Courtois was still smoking a pack of cigarettes a day.  Courtois reported an increase in his "smoker's cough."  Courtois also reported lower rib pain.  Dr. Town continued Courtois' medications and ordered a chest x-ray.  R. 480. The x-ray showed no evidence of acute pulmonary disease.  R. 517.

Courtois saw Dr. Town again on January 15, 2009.  Courtois continued to walk with a cane.  Dr. Town reported that, "He does not feel that he would be able to do any kind of job that involved lifting, walking, standing or sitting for long periods of time because of his knees, they lock and he cannot get up and walk."  R. 515.  Dr. Town also noted Courtois' continued problems with COPD.  Courtois continued to smoke a pack of cigarettes per day.  Courtois reported that his COPD medicines Advair and Spiriva were helpful.  He stated that he did not need to use his rescue inhaler every day.  Dr. Town found prolonged expiration with very little air movement.  Dr. Town found pain with palpation of the patella bilaterally and with lateral and medial joint line, as well as pain with flexion and extension. Courtois was unable to fully flex his right leg, but could fully extend the left. Courtois was taking Tramadol and Celebrex for knee pain. R. 515.

On January 19, 2009, Courtois underwent another pulmonary function test.  Dr. Somanna again performed the test.  The spirometry

showed an FEV1 of 1.78 liters and an FVC of 3.01 liters.  After a

bronchodilator therapy, Courtois had an FEV1 of 2.08 liters, a 16%

improvement.  Lung volume testing showed lung capacity of 92% predicted

with an RV of 142% predicted.[6]  Dr. Somanna concluded that Courtois had

severe obstruction with significant change after post-bronchodilator

therapy.  The lung volumes showed air trapping with DLCO mildly

impaired.  Dr. Somanna noted that Courtois' FEV1 had improved since his

last pulmonary function tests in July 2007.  R. 518.

On January 29, 2009, Courtois saw Dr. Town again to discuss his

application for disability.  On examination, Dr. Town found prolonged

expiration with wheezes.  Dr. Town found no edema.  Dr. Town again

counseled Courtois to quit smoking.  R. 514.

On January 29, 2009, Dr. Town also filled out a form entitled "Medical

Source Statement of Ability to Do Work-related Activities (Physical)" (MSS

Form) R. 523-26.  Dr. Town opined that Courtois' impairments affected his

ability to lift.  The form then asked how much weight a person could

frequently or occasionally lift.  The form had boxes to check to indicate the

amount of weight a person could lift.  Dr. Town did not check any of the

_____

[6]RV stands for residual volume of air that remains in the air sacs continuously.
See. American Medical Association, Complete Medical Encyclopedia (2003), at 1041.

3:11-cv-03427-BGC   # 15   Page 13 of 42

boxes.  Instead, Dr. Town wrote on the form, "Patient uses a cane and cannot lift/carry with proper form to avoid injury."  R. 523.

Dr. Town opined that Courtois could stand and/or walk for less than two hours in an eight-hour day.  Dr. Town noted that prolonged standing was limited because Courtois had bilateral severe osteoarthritis of his knees.  Dr. Town also stated that Courtois had severe COPD and could not be physically active for more than five minutes.  Dr. Town stated that in the office Courtois was "short of breath at 20 feet."  R. 523.  Dr. Town opined that Courtois needed to alternate between sitting and standing because of his arthritis.  Dr. Town opined that Courtois was limited in the use of his upper and lower extremities because of his COPD and arthritis.  Dr. Town opined that Courtois should never perform climbing, balancing, kneeling, crouching, crawling, or stooping, but was unlimited in reaching, handling, fingering, and feeling.  R. 524-25.  Dr. Town opined that Courtois should not be exposed to dust, humidity, or fumes because of his COPD.  Courtois' arthritis would limit his ability to respond to hazardous situations and vibrations.  R. 526.  Dr. Town and her supervisor, Dr. T. Myers, M. D., both signed the MSS Form on January 29, 2009.  R. 526.

On February 11, 2009, Courtois saw Dr. Town again.  Courtois reported some improvement in his COPD with Advair and Spiriva.  He reported using his inhaler at night and once or twice a day.  Courtois

**Page 13 of  42**

continued to have severe pain in both knees, but refused either steroid or
Synvisc injections at the time.  Dr. Town discussed Courtois' case with a
sport medicine specialist who did not feel that a knee brace would help.
Courtois had prolonged expiration with very poor air movement, but no
wheezes.  Dr. Town noted brawny skin changes related to venostasis, but
no edema.  R. 512-13.

On March 11, 2009, Dr. Town noted a faint expiratory wheeze and
poor air movement.  Courtois reported still smoking a pack of cigarettes a
day.  His mother bought the cigarettes for him.  Courtois, however, could
not afford the $3.00 copay for his Advair.  R. 511.  Courtois again refused
an injection in his right knee.  Dr. Town again counseled Courtois to quit
smoking.  R. 511.

On April 28, 2009, Courtois saw Dr. Town.  Courtois reported that he
ran out of his Advair and Spiriva and had increased shortness of breath.
Courtois reported continued knee pain, "but has been able to ambulate and
perform his daily activities."  R. 509.  On examination, Courtois weight was
330 pounds.  Dr. Town heard loud wheezing bilaterally in the lungs, no
rhonchi, and prolonged expiration.  R. 509.  Dr. Town gave Courtois a
three-month supply of the COPD medicine Symbicort.  Dr. Town also
advised Courtois, "to quit smoking entirely so that he can afford his meds."
R. 510.

On June 12, 2009, Courtois saw Dr. Town again.  Courtois was still using a cane to walk.  Courtois reported that, "he is able to do all of his activities of daily living and most things that he wants to do with the way his knees are right now."  R. 505.  Courtois bought cigarettes the previous week instead of Spiriva.  He was taking his Advair and using his rescue inhaler more frequently.  Courtois reported that his breathing was sometimes exacerbated by humidity, but otherwise was as good "as it has ever been."  Dr. Town found prolonged expiration but not wheezing. R. 505.

On July 10, 2009, Courtois saw Dr. Town.  Courtois told Dr. Town that he was taking his COPD medication.  He was using his rescue inhaler twice a day because of the humidity.  Courtois reported that when it is not humid, he hardly uses his inhaler.  Courtois also continued to smoke.  His mother still bought him cigarettes.  Courtois felt more shortness of breath than at the last visit.  He reported that he could not walk more than 20 steps without stopping to rest, but his breathing easily recovered after he stopped.    Dr. Town again found prolonged expiration without wheezing. Courtois reported that his left knee was hurting more.  Courtois reported that he could not stand for longer than five minutes.  Dr. Town consulted with a Dr. Daniels about Courtois' degenerative joint problems.  Dr. Daniels recommended trying avocado soy bean pills, applying Capzasin cream on

the front of the knee or the knee sleeve, riding a bicycle to strengthen the quadriceps, and losing weight.  R. 502-03.

On August 14, 2009, Courtois saw Dr. Town.  Courtois switched his COPD medication to Symbicort.  Courtois reported only using his rescue inhaler two to three times per week, depending on the weather.  Courtois reported that he cut back one pack of cigarettes per day from two packs a day.  Dr. Town found some prolonged expiration without wheezing or rhonchi.  R. 501.

On September 25, 2009, Courtois saw Dr. Town.  His breathing was worse because he was out of Symbicort and because of the humidity.  He was sleeping poorly.  Courtois wondered whether he should use oxygen at night.  Dr. Town found very prolonged expiration with poor air movement at the bases and bilateral wheezes.  R. 499.

On October 16, 2009, Courtois saw Dr. Town.  Courtois reported that his breathing was better since he was using oxygen at night.  He still woke up at night, but refused to undergo a sleep study or wear a CPAP machine.[7]  Courtois was taking his medications as prescribed.  Courtois reported that, "He is hardly using his inhaler at all."  R. 497.  On

---

[7]CPAP stands for "continuous positive airway pressure."  See American Medical Association, Complete Medical Encyclopedia (2003), at 1131.

examination, Dr. Town found prolonged expiration, faint wheezes and end-expiratory, but no rhonchi.  R. 497.

On November 14, 2009, Courtois went to the emergency room with acute respiratory problems with coughing and shortness of breath.  R. 531-37.  An x-ray showed slight worsening of Courtois' chest compared to the December 12, 2008, x-ray.  R. 535.

On November 13, 2009, Dr. Town added a note to the January 29, 2009, MSS Form.[8]  The note stated that Courtois' condition "is worsened in that he now requires oxygen supplementation at night.  Otherwise my medical conclusions remain unchanged from 1/29/09."  R. 526.

Courtois saw Dr. Town a few days later on November 19, 2009. Dr. Town stated that Courtois continued to have significant knee pain and now worsening low back pain, but no pain radiating down his legs and no numbness, tingling, or weakness.  Dr. Town noted that the condition "may be exacerbated by using cane."  R. 528.  Dr. Town also noted faint wheezing, prolonged expiration, and poor air movement.  R. 529.  Courtois' weighed 344 pounds at the visit.  Dr. Thomas Miller, M.D., another member of Dr. Town's practice, concurred in Dr. Town's diagnosis.  R. 529.

---

[8]The date of the supplemental note is unclear due to Dr. Town's handwriting and possible photocopying problems.  The date could be either November 13, 2009, or November 18, 2009.

On December 18, 2009, Courtois saw Dr. Ben Wilde, M.D., of the same practice group as Dr. Town.  Courtois stated that his COPD was well controlled with medication.  Dr. Wilde stated that Courtois was supposed to be on oxygen "24/7" but was not using oxygen at the time of the office visit. Courtois reported smoking a pack of cigarettes a day.  Courtois refused a recommended sleep study.  Courtois complained of back pain.  Courtois reported that he went to physical therapy for his back.  Courtois said that the physical therapy session relieved his pain for two or three days, but the pain returned.  Courtois was convinced that the therapy was not working. On examination, Dr. Wilde found Courtois' breath sounds to be clear and equal bilaterally to auscultation.  R. 609-10.  Dr. Wilde listed the diagnoses as, "COPD, Noncompliance."  R. 610.

On January 14, 2010, the Administrative Law Judge (ALJ) held an evidentiary hearing.  The ALJ was in Chicago, Illinois.  Courtois and his attorney appeared by video conference from Hannibal, Missouri. Vocational expert Dr. Chrisanne Chiro-Geist, Ph.D., appeared by telephone.  R. 35, 159.  Courtois amended his application to change his claimed onset date to January 1, 2008.  Courtois' counsel stated that Courtois revised his claim to coincide with his treatment records.  R. 36, 40. Courtois then testified.  Courtois testified that he was five feet nine inches tall and weighed 350 pounds.  R. 37.  Courtois was divorced and lived with

his mother.  He had lived with her for ten years.  Courtois completed the
tenth grade.  R. 38.  Courtois testified that he last worked as a grocery
store stocker until was fired on August 12, 2007, for buying liquor for a
minor.  He worked at this job for 11 years until he was fired.  Courtois
worked as a janitor before that.  R. 39-40.

Courtois testified that he would not be working even if he had not
been fired because of his knees and his breathing problems.  R. 39-40.
Courtois said that he had sharp pain in his knees "like somebody's sticking
a knife in there and just twisting it, you know."  R. 40.  He rated the pain,
with medication, as a seven on scale of zero to 10, and said that the pain
was "pretty much always there."  R. 40.  He said that on a good day the
pain would be five on a scale of zero to 10.  He said that he had about one
good day a week.  R. 41.

Courtois testified that he could not squat down or get on the floor
because of his knees.  He also said that he had trouble getting up.  R. 41.
He testified that he could walk about 50 feet before he needed to stop
because of his knees.  R. 47.  He testified that he got short of breath after
walking 20 feet.  R. 52.  He said that the right knee was worse than the left.
He said that two orthopedic surgeons refused him for surgery on his knees.
The doctors did not tell him why.  R. 42.  Courtois testified that he tried
physical therapy, but it did not help.  R. 42.  Courtois testified that he saw

Dr. Town for his knees.[9]  Courtois did nothing for his knee pain aside from medication.  R. 42-43.

Courtois described his breathing problems as shortness of breath. R. 43.  He said that he has had the problem for three or four years.  He testified that walking made him short of breath.  R. 43.  He also testified that talking made him short of breath.  R. 52.  He also tried doing dishes and mowing, but became short of breath.  R. 52.  Courtois testified that he was on oxygen constantly.  He previously used oxygen only at night.  R. 43.  Courtois testified that he still had problems walking even with the oxygen.  R. 43-44.  Courtois testified that he smoked a pack of cigarettes a day.  He testified that he tried to quit.  R. 44.

Courtois testified that he suffered from depression, anger, and suicidal thoughts.  He said that the loss of work and his situation caused him to have these problems.  He described his depression symptoms as "Bouts of crying.  Fits of rage."  R. 44.  He said that when he got angry or had a fit of rage he yelled at people.  He testified that he had suicidal thoughts about once every six months.  R. 45.  He testified that he cried every day, three to four times a day.  The crying spells usually last ten to fifteen minutes.  R. 53.  He testified that he took medication for his

---

[9]The hearing transcript spells Dr. Town's name "Towne."  The medical record spell her name "Town."  The Court uses the spelling in the medical records.

depression and to help him sleep.  The medications helped a little bit.

R. 45.   He also saw a therapist once a week.  R. 45-46.

Courtois testified that his sleep was typically interrupted five to six

times a night.  R. 55-56.  Courtois did not know what was waking him up.

Courtois slept on the couch because he could not sleep flat.  R. 56.

Courtois testified that in an average day, he ate breakfast and

watched TV.  He said that he could not do much else because of his knees

and his breathing.  R. 46.  He did not do any cooking, laundry, or grocery

shopping.  R. 46-47.  Courtois testified that he took two to three naps a

day. R. 51.  He could shower and dress himself.  R. 47.  He could only

shower for three to four minutes, however, because the steam made him

short of breath.  R. 55.  He had to sit and rest five minutes after the shower

to catch his breath.  R. 55.  He did not wear socks anymore because he

could not reach his feet.  He also left his pants on the floor so he can just

step into them to put them on.  R. 54.  He only wore slip-on  tennis shoes

because he could not tie laces.  R. 55.

Courtois testified that he could walk a total of two hours in an eight-

hour day.  R. 47.  He said that two hours was pushing it and that he never

walked that much in a day.  R. 47.  He testified that he could stand for five

minutes before he would need to sit down.  He would need to sit down

because of his knees and back.  He testified that he could sit for thirty

minutes at a time.  He testified that he could sit for a total of three or four hours in an eight-hour day.  R. 48-49.  Courtois testified that he was most comfortable lying down.  He testified that he could lie on his couch  up to two hours at a time.  He typically lay on his couch off and on for most of the day.  R. 49.

Courtois testified that he could lift 15 pounds.  He had trouble walking.  He said that he, "Just have to wait for my knees when I walk." R. 49.  He testified that he had to stop to catch his breath when he climbed stairs.  R. 49-50.  He testified that he had to stop every 10 stairs to catch his breath.  R. 51.  Courtois testified that he still had swelling in his legs. He did not wear the compression stockings anymore because his legs got hot when he wore them during the summer.  R. 50.  Courtois testified that when his legs swelled, he lay down and propped his legs up about four inches.  R. 52.  Courtois testified that his left leg swelled three to four times a week.  R. 53.  He testified that he needed to remain down with his leg propped up for three to five hours to try to get the swelling down.  R. 53.

Courtois testified that one of the orthopedic surgeons who examined him prescribed using a cane to walk.  R. 50.  Courtois testified that he always used the cane.  R. 51.

Courtois testified that he could drive for 30 minutes at a time.   After 30 minutes, he needed to get out of the car and stretch his knee.  R. 54.

Courtois testified that he had pain in his lower back.  The pain was worse on his right side.  The pain went down into his legs.  He said the pain went down to his thigh on his right side.  R. 57-58.  He testified that the pain was, "like somebody set my back on fire."  R. 58.  He also testified that his thigh sometimes got numb and hurt.  R. 58.  The left leg had similar symptoms but not as painful.  R. 58.

Chiro-Geist then testified.  Before testifying, Chiro-Geist asked Courtois how long it took to train him to do the grocery stocking job.  Courtois said one week.  R. 59-60.

The ALJ then asked Chiro-Geist to assume a person with Courtois' age, education, and work experience who was capable of performing sedentary work but could only occasionally climb ramps and stairs; could not climb ladders, ropes, and scaffolds; could not kneel or crawl; must avoid concentrated exposure to pulmonary irritants like fumes; and must avoid temperature extremes and extreme humidity.  The ALJ also asked Chiro-Geist to assume that the person could sustain attention and concentration to perform unskilled work and could occasionally interact with the general public and co-workers.  R. 60.

Chiro-Geist opined that such a person could not perform Courtois' past  work.  R. 60.  Chiro-Geist opined that such a person could perform inspection work, sedentary assembly work, and sedentary packing work.

She opined that 5,503 inspection jobs, 9,390 assembly jobs, and 2,004 packing jobs existed in the region.  R. 61.  She testified that the region included all of Illinois and part of Missouri.  R. 61.

The ALJ then asked Chiro-Geist to assume that the person needed to prop up his feet three to four times a day for four to five hours a day. Chiro-Geist opined that such a person could not perform any of the jobs she identified.  R. 61.

The ALJ then asked Chiro-Geist to assume that the person had to periodically alternate between sitting and standing, but could only stand and/or walk for less than two hours and needed to use a cane to do so. The person could not climb, balance, kneel, crouch, crawl or stoop, but could frequently reach, handle, finger and feel.  The person also needed to avoid temperature extremes, dust, vibrations, humidity, wetness, hazards, fumes, odors, chemicals, and gases.  R. 62.  Chiro-Geist opined that the person could not perform any sedentary work, including the identified jobs, because a person must be able to walk for two to three hours in a day to be able to perform sedentary work.  R. 62.

At the end of the hearing, the ALJ gave Courtois thirty days to supplement the record.  R. 65.

## THE DECISION OF THE ALJ

The ALJ issued her decision on April 20, 2010.  The ALJ followed

the five-step analysis set forth in Social Security Administration regulations

(Analysis). 20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely impaired

that he is disabled regardless of the claimant's age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The listings of such

severe impairments are set forth in 20 C.F.R. Part 404 Subpart P,

Appendix 1 (Listing).  The claimant's condition must meet the criteria in a

Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d),

416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his residual

functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the

claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).  The claimant has the burden of presenting evidence and

proving the issues on the first four steps.  The Commissioner has the

burden on the last step; the Commissioner must show that, considering the

listed factors, the claimant can perform some type of gainful employment

that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313

(7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ determined that Courtois met his burden at Steps 1 and 2.

He was not gainfully employed and he suffered from severe impairments of

COPD, obesity, hypertension, tobacco abuse, degenerative joint disease of

the right knee, venous peripheral insufficiency, and depression.  R. 18.

The ALJ determined at Step 3 that Courtois did not meet any Listing.

The ALJ considered Listings 1.02 for osteoarthritis, 3.02 for COPD, and

12.04 for depression.  The ALJ determined that Courtois did not meet

Listing 1.02 because the Listing requires that the person must require the

use of two canes or crutches (or the assistance of another person) to walk,

and Courtois was not so limited.  Courtois did not meet Listing 3.02

because the Listing requires the FEV1 value of a pulmonary function test

for a person of Courtois' height to be equal to or less than 1.45 liters with

broncodialation, and Courtois FEV1 values were 1.78 liters and 2.08 liters

after bronchodialation.  R. 19.

The ALJ found that Courtois' mental limitations did not meet Listing

12.04 for mood disorders because his condition did not meet the criteria in

paragraphs B or C of the Listing.  To meet Listing 12.04, the person's condition must meet both Paragraphs A and B, or meet Paragraph C. Paragraph B requires that the person's mental impairment result in at least two of the following: marked restrictions on daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  The ALJ found no marked difficulties in any of the three areas and no episodes of decompensation. R. 19.

Paragraph C requires (1) repeated episodes of decompensation; (2) a residual disease process that has resulted in marginal adjustment to even minimal increases in mental demands or changes in environment; or (3) a history of an inability to function outside a highly supportive living arrangement with an indication of a continued need for such an arrangement.  The ALJ found that Courtois did not meet any of these conditions.  R. 20.

The ALJ also considered whether Courtois' obesity, in combination with his other impairments, equaled a Listing.  The ALJ determined that Courtois' obesity did not result in a sufficiently severe impairment, either alone or in combination with his other impairments, to equal any Listing. R. 21.

At Step 4, the ALJ found that Courtois had an RFC to perform sedentary work except that he could occasionally climb ramps and stairs, but could not climb ladders, ropes, or scaffolds; could not kneel or crawl; should avoid concentrated exposure to pulmonary irritants; and could sustain attention and concentration to perform unskilled work with occasional interaction with the general public.  R. 21.

The ALJ found that Courtois' testimony about the severity of his condition was not credible.  The ALJ noted that Courtois' COPD was well controlled when he used his medication.  The ALJ noted that the medical records indicated that he was often noncompliant, and on occasion, bought cigarettes rather than paying the $3.00 copay for medication.  R. 22.

The ALJ found that the RFC's restrictions on exposure to concentrated pulmonary irritants, "is more than sufficient, when combined with the claimant's prescribed course of treatment to allow some work." R. 22.  The ALJ noted, "When the claimant is compliant with his medications, he is noted as stating that he did not use his inhaler at all." R. 22.

The ALJ found that Courtois had degenerative joint disease in the right knee.  The ALJ, however, noted that Courtois did not participate in the recommended physical therapy or exercises.  The ALJ also doubted the severity of the condition of Courtois' left knee.  The ALJ noted that no

specialist ever found osteoarthritis of degeneration in the left knee.  The ALJ noted that Courtois reported to his doctor that he was doing all of the activities of daily living.  The ALJ found that Courtois used a cane, but the cane was not prescribed by a physician.  The ALJ found that Courtois was a poor candidate for surgery because conservative measures were more appropriate for his condition.  R. 23.

The ALJ also relied on the opinions of Dr. Leung, Dr. Wheeler, and Dr. Bilinsky to support her RFC finding.  R. 23-24. The ALJ also found that the records from Blessing Hospital and Outreach Clinic were consistent with the RFC determination.  The ALJ found, "The claimant was seen and effectively treated for chronic venous insufficiency, high blood pressure and COPD at these locations.  The opinions are supported by objective medical evidence including the claimant's pulmonary function tests."  R. 24.

The ALJ found that Dr. Town's treatment notes supported the RFC finding.  The ALJ, however, did not give weight to Dr. Town's opinions in the MMS Form.  The ALJ stated that those opinions were inconsistent with Dr. Town's own treatment notes.  R. 23-24.

The ALJ then determined at Step 4 that Courtois could not perform his past relevant work.  The ALJ relied on Courtois' RFC and Chiro-Geist's opinions for this conclusion.  At Step 5, the ALJ determined that Courtois could perform a significant number of jobs in the national economy.  The

ALJ relied on the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and Chiro-Geist's opinions that a person of Courtois' age, education, work experience, and RFC, could perform sedentary inspection, assembly and packing jobs, and that significant numbers of those jobs exist in the national economy.  R. 25-26.  The ALJ, therefore, concluded that Courtois was not disabled.

Courtois appealed the decision to the Appeals Council.  On June 21, 2010, Courtois sent additional medical records to the Appeals Council. R. 314-15.  The records included results of a new pulmonary function test performed on March 9, 2010, by Dr. Venu Reddy, M.D.  The spirometry study showed the FEV1 of 1.3 and FEV of 2.19 without bronchodialator therapy.  The report states that the FEV1 and FEV values significantly improved after used of a bronchodialator.  The report, however, did not list the post-bronchodialator therapy results.  Dr. Reddy stated that the FVC and FEV1 values decreased compared to the previous study.  R. 614.

On November 8, 2010, Courtois filed a new application for Disability Benefits.  Brief in Support of Motion for Summary Judgment (d/e 8), Exhibit A, Letter from Social Security Administration dated February 18, 2011.  On February 18, 2011, the Social Security Commission notified Courtois that he qualified for supplemental security income as of November 2010 pursuant to his November 8, 2010, application.  Id.  On May 29, 2011,

the Social Security Administration notified Courtois that he qualified for

disability benefits under the November 8, 2010,  application.  The Social

Security Administration found in this second application that Courtois

became disabled on April 20, 2010.  Brief in Support of Motion for

Summary Judgment (d/e 8), Exhibit A, Letter from Social Security

Administration dated May 29, 2011.  On August 19, 2011, Courtois notified

the Appeals Council hearing this case of the decisions approving Courtois'

November 8, 2010, application for Disability Benefits.  R. 326.

On November 7, 2011, the Appeals Council denied Courtois' request

for review of the ALJ's April 20, 2010, Decision.  Courtois then filed this

action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is

supported by substantial evidence.  In making this review, the Court

considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate"  to

support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the ALJ's findings if they are supported by

substantial evidence, and may not substitute its judgment for that of the

ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not

review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's Decision is supported by substantial evidence.  The record supports the findings at Steps 1 and 2.  At Step 3, the pulmonary function tests support the finding that Courtois did not meet Listing 3.02 for COPD. The FEV1 value after bronchodilation on all three tests in the record before the ALJ exceeded the required level of 1.45 liters.  Courtois did not meet Listing 1.02 for degenerative joint disease because he only used one cane to ambulate.  The ALJ also found that Courtois' mental condition did not meet Listing 12.04 for depression.[10]

The ALJ's RFC finding was supported by the record.  The opinions of Dr. Bilinsky and Dr. Nenaber supported the findings.  Portions of Courtois' testimony also supported the ALJ's RFC finding.  Courtois testified that he could lift 15 pounds.  He also testified that he could walk for two hours in an eight-hour day and sit for three hours in an eight-hour day.  R. 47-49.

---

[10]Courtois does not dispute the finding that he did not meet Listing 12.04.

Dr. Town's treatment notes indicated repeatedly that Courtois' breathing was better when he used his oxygen at night and medication as prescribed.  For example, in August 2009 and October 2009 Courtois reported to Dr. Town that his breathing was improved and that he rarely used his rescue inhaler when we was compliant his oxygen and medication.  R. 497, 501.  Dr. Town's treatment notes also recorded that, even with his knee problem, Courtois could perform all of his daily activities and could do most of the things he wanted to do.  R. 505, 509.

The record also supports the ALJ's conclusion that Courtois had access to his medication and oxygen.  Courtois qualified for Medicaid (or Medicare) disability coverage, and so, had coverage for his medical needs. The copay for his medication was $3.00.  Courtois maintained a pack-a-day cigarette habit; his ability to support this habit provided substantial evidence that he had access to the financial resources necessary to pay the costs for his medicine. In sum, the record provides substantial evidence to support the inference that Courtois could perform sedentary work subject to the limitations set forth in the ALJ's RFC.

The ALJ's findings at Step 4 are supported by the opinion of vocational expert Chiro-Geist that Courtois could not perform his prior work.  The ALJ's findings at Step 5 are supported by the Medical Vocational Guidelines and Chiro-Geist's opinion that a person with

Courtois' age, education, work experience, and RFC could perform sedentary inspection, assembly, and packing jobs.  The ALJ's conclusion that Courtois' was not disabled is supported by substantial evidence.

Courtois argues that the ALJ erred by not giving controlling weight to Dr. Town's opinions set forth in the MSS Form.  An opinion from an acceptable medical source who treated the claimant is entitled to controlling weight when the opinion is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); SSR 96-2p.   Dr. Town, as a doctor of osteopathy, is an acceptable medical source.  20 C.F.R. § 404.1513(a).  The ALJ did not give Dr. Town's opinions on the MSS Form controlling weight because the ALJ found that those opinions were not supported by other medical evidence and inconsistent with other evidence in the record.  Substantial evidence supports the ALJ's conclusion.

The ALJ found that Dr. Town's opinions were inconsistent with her treatment notes.  Substantial evidence supports this finding.  Dr. Town opined that Courtois' COPD and osteoarthritis limited Courtois' ability to engage in any significant physical activity.  The treatment notes, however, stated that when Courtois took his COPD medicine, his breathing improved significantly.  The treatment notes also stated that even with his arthritic

knees, Courtois could still do "most things that he wants to do with the way his knees are right now."  R. 505.  These portions of the treatment notes provide substantial evidence to support the ALJ's conclusion that Dr. Town's opinions were not well support by evidence in the record.

Courtois criticizes the ALJ's refusal to accept Dr. Town's opinion that he had degenerative joint disease in both knees, not just the right.  Again, substantial evidence supports the ALJ's conclusion.  The medical records contain no radiological study of Courtois' left knee.  The only study was an MRI of his right knee.  The examinations by Barry and Dr. Town found swelling and crepitation in the right knee, not the left.  Dr. Town once found some tenderness with palpitation in both knees, but otherwise the only evidence of problems with the left knee was Courtois' subjective statements.  Based on the record, the ALJ could properly conclude that Dr. Town's opinion that Courtois had degenerative joint disease in the left knee was not supported by medically acceptable clinical and diagnostic techniques, and so, was not entitled to controlling weight.

Courtois criticizes the ALJ for rejecting Dr. Town's opinion that Courtois had to use a cane to ambulate.  The ALJ rejected this opinion because the ALJ found that no doctor prescribed the use of a cane.  Substantial evidence supports the ALJ's finding.  Courtois point to no medical record in which any medical professional either prescribed or

recommended the use of a cane.  Courtois told the physical therapist that

he bought the cane.  Dr. Town certainly never prescribed the use of the

cane.  Dr. Town stated that the use of the cane may have exacerbated

Courtois' back problem.  R. 528.  Courtois testified that one of the

orthopedists that he saw prescribed the cane.  The ALJ did not find that

testimony to be credible.  The Court will not disturb the ALJ's conclusion on

this point.  The medical records do not contain any prescription of a cane.

No orthopedist treated Courtois.  He saw two orthopedists for consultations

regarding whether he was a candidate for surgery.  It seems unlikely that

the orthopedists would prescribe treatment when he was only seeing a

patient for a surgical consultation.  Under these circumstances, the Court

will not disturb the ALJ conclusion that no doctor prescribed the use of the

cane.

     Dr. Town's opinions were also inconsistent with other evidence in the

record.  Her opinions about Courtois' exertional limitations were

inconsistent with Dr. Bilinsky's opinions and with Courtois' testimony at the

hearing.  Dr. Bilinsky opined that Courtois could sit for six hours, stand

and/or walk for two hours and could lift 10 pounds.  Courtois testified that

he could lift 15 pounds, could walk for two hours in an eight-hour day, and

sit for three hours in an eight-hour day.  Dr. Town opined Courtois could do

none of these things.  Dr. Town's opinions were inconsistent with this

evidence.  Substantial evidence, therefore, supports the ALJ's decision not to give Dr. Town's opinions controlling weight.

Courtois argues that even if Dr. Town's opinions were not entitled to controlling weight, they were entitled to some weight.  The ALJ, however, gave some weight to Dr. Town's opinions.  The ALJ gave weight to Dr. Town's opinions in her treatment notes.  See R. 24-25.  Because the ALJ referenced Dr. Town's opinions and gave weight to some of them, the Court finds no reversible error in the ALJ"s decision not to give weight to Dr. Town's other opinions.

Courtois next argues that the ALJ erred by not properly assessing his mental limitations in formulating the RFC.  Courtois argues that the ALJ was required to perform a function-by-function analysis in formulating the RFC.  The Court sees no error.  The ALJ may use a narrative discussion of a claimant's symptoms and medical source opinions to explain the basis for her analysis of the mental limitations in the RFC.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (cited with approval in Knox v. Astrue, 327 Fed.Appx. 652, 657 (7th Cir. 2009)).  The ALJ considered Courtois' mental limitations due to his depression and concluded that he was limited to unskilled work and only occasional interaction with the general public.  Courtois cites no medical evidence regarding his depression that was

inconsistent with this RFC analysis.  The Court, therefore, finds no reversible error.

Courtois next argues that the RFC was not supported by substantial evidence.  The Court disagrees. As discussed above. the RFC finding was supported by portions of Courtois' testimony, the opinions of Drs. Bilinsky and Nenaber, and portions of Dr. Town's treatment notes.

Courtois next argues that the ALJ erred in refusing to find that he met Listing 1.02 for COPD and 3.02 for degenerative joint disease.  As discussed above, the ALJ's findings were supported by substantial evidence.  The pulmonary function tests supported the finding with respect to Listing 1.02,  and the fact that Courtois did not use two canes to ambulate supported the finding with respect to Listing 3.02.

Courtois argues that the March 9, 2010, pulmonary function test shows that Courtois met Listing 1.02 for COPD.  This test was not submitted to the ALJ, and so, is not a basis for reversing the decision under sentence 4 of § 405(g).  Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004).  The late test could only be a basis for a remand under sentence 6 of § 405(g).  42 U.S.C. § 405(g).  Courtois did not ask for a sentence 6 remand.  Even if he did, the request would not be granted.  To receive a sentence 6 remand, the new evidence must be material.  Sample v. Shalala, 999 F.2d 1138, 1144 (7th Cir. 1993).  The March 9, 2010, test

results submitted are not material.  Listing 1.02 requires an FEV1 value of 1.45 liters or less after administration of a bronchodilator for a person of Courtois' height.  The March 9, 2010, test results did not state the FEV1 value for Courtois after bronchodilation.  The test result failed to include the critical information.  As such, the document would not constitute material evidence necessary to secure a sentence 6 remand.

Courtois argues that the ALJ improperly found that Courtois was not disabled if he followed his prescribed COPD medication and oxygen, and any inability to work is due to noncompliance.  The argument is not applicable.  The regulation cited concerns situations in which the individual was disabled because he failed to comply with medical treatment.  The ALJ did not find that Courtois was disabled due to his failure to comply. 20 C.F.R. § 404.1530; SSR 82-59.  The ALJ found that he was not disabled even with his current level of compliance.

Courtois argues that the ALJ erred in not considering whether the combination of his impairments established that his condition equaled a Listing.  The Court disagrees.  The ALJ considered the combination of Courtois' conditions in finding that he did not meet a Listing.  Courtois' arguments to the contrary are not persuasive.

Courtois argues that the ALJ erred in his credibility determination. This Court will not review the credibility determinations of the ALJ unless

the determinations lack any explanation or support in the record.  Elder v.

Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  In this case, the ALJ

explained her reasoning.  The ALJ noted that Courtois was noncompliant

with his medicine and prescribed treatment.  Courtois simply did not show

up for physical therapy sessions.  Courtois repeatedly did not purchase or

take prescribed medications for his COPD.  The failure to comply is

relevant to question the severity of the individual's pain and the need to

relieve it.  See Schmidt v. Astrue, 496 F.3d 833, 844 (7th Cir. 2007).

Additional evidence also supports the credibility finding.  Courtois

testified in January 2010 that his back pain radiated into his legs, notably

his right thigh, and caused numbness and tingling.  R. 58.  Dr. Town's

notes from November 2009 stated that Courtois' back pain did not radiate

into his legs and did not cause numbness or tingling.  R. 528.  Courtois

testified that he tried physical therapy for his knees, but it did not help.  The

medical record states that he did not try physical therapy.  He was

evaluated for physical therapy for his knees, but never showed up for the

scheduled therapy sessions.  R. 42, 440-43.  Courtois also testified in

January 2010 that he had swelling in his legs three to four times a week.

R. 50-53.  The medical records, however, show no complaints or

observations of swelling in his legs in all of 2009.  These inconsistencies

provide some additional support for the ALJ's credibility finding.  The Court

will not overturn the ALJ's credibility determination in light of the ALJ's explanation and the support in the record.  <u>Elder</u>, 529 F.3d at 413-14.

Courtois argues that the ALJ erred by not considering all of the vocational expert's opinions.  The Court sees no error.  The ALJ applied the opinions that were consistent with her factual findings regarding Courtois' RFC.  The other hypothetical questions were not relevant and the ALJ was not required to address them.

Last, Courtois argues that the ALJ erred because Courtois was determined to be disabled as of April 20, 2010, pursuant to the November 8, 2009, disability application, but the ALJ issued her opinion that he was not disabled on the same day, April 20, 2010.  Courtois argues that the inconsistency in the two decisions requires remand.  The Court disagrees. This Court reviews the ALJ's decision to determine whether the decision was supported by substantial evidence that was before the ALJ.  The November 8, 2009, application and the evaluation of that application are not relevant to this review.  Furthermore, the inconsistency is limited to whether Courtois was disabled on one day, April 20, 2010.  Both decisions agree that he was not disabled before that date, and the ALJ's decision does not address whether he was disabled after that date.  The one-day overlap is harmless because Courtois received the benefit of the disability

determination for that one day in the approval of his November 8, 2009, application.

WHEREFORE, Plaintiff Jeffrey Lee Courtois' Motion for Summary Judgment (d/e 8), is DENIED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) is ALLOWED.  The decision of the Commissioner is AFFIRMED.  THIS CASE IS CLOSED.


ENTER:     September 13, 2012


_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE